## MIDDLE DISTRICT,

### 1857.

————o————

## COUNTY OF KENNEBEC.

————o————

JOSEPH BURTON *versus* THE COUNTY OF KENNEBEC.

The amendments to the constitution under the resolves of March 17, 1855, contain no express abrogation of any of the provisions of that instrument, except as to the mode of filling the offices referred to, and the old mode of appointmen is not repealed any farther than it interferes with the practical operation of the mode prescribed in the same amendments.

Offices which had been filled by executive appointment, and which were afterwards to be filled by vote of the people, under the amendments which became parts of the constitution, before these officers could act by virtue of their election, were properly filled during this interval by executive authority.

The following facts in this case were agreed by the parties.

This is an action to recover eight months' salary, from February 1, A. D. 1856, to October 1, A. D., 1856, as register of probate within and for the county of Kennebec; on the 28th day of February, A. D., 1854, the plaintiff was duly commissioned, and on the first day of March following qualified, to act as register aforesaid; on the 17th of March, 1855, the legislature passed certain resolves for an amendment of the constitution relating to the elective franchise; on the 19th day of November, 1855, a report was made in council relating to the votes of the people upon the proposed amend-

ments; on the 2d day of January, 1856, a message was sent to the legislature by Governor Morrill, transmitting the report of council upon the proposed amendments; on the 28th day of February, 1856, the legislature passed a resolve declaratory of amendments of the constitution; on the 23d day of January, 1856, Francis Davis was commissioned by the governor and council, register of probate for said county; on the 27th day of January, 1856, he was qualified, and on the first day of February, 1856, entered the probate office and demanded possession of the records, &c.; the plaintiff declined to give him possession, claiming himself to be register, said he was ready to perform the duties of said office, and should claim the payment of the salary; Davis insisted upon taking possession, and did so accordingly; the plaintiff left the office under protest, still claiming to be register, waiving no rights, expressing his readiness to perform the duties of said office, and notifying the Judge of Probate to that effect; said Davis remained in possession of the office, performing the duties thereof and receiving his pay therefor, until the first day of January, A. D. 1857, when he was succeeded by the plaintiff, by virtue of an election by the people under the constitution as amended.

The plaintiff made demand of the county treasurer for the amount of salary sued for prior to the commencement of this action.

*R. H. Vose,* counsel for the plaintiff.

This is an action of assumpsit brought by the plaintiff to recover a portion of his salary as register of probate. It is admitted that he was duly commissioned for said office on the 28th day of February, A. D. 1854, and that on the first day of March following, having been duly qualified, he entered upon the discharge of his duties; that he continued to perform them until the first day of February, 1856, when he was ousted by Francis Davis, who claimed to be register, by virtue of a commission bearing date January 23, 1856. It is also admitted that the plaintiff was ready to perform the

duties of said office; that he claimed the right, and the payment of the salary; that he notified the Judge of Probate to that effect, and only left the office under protest. The salary of the register is a sum certain. It is paid by the treasurer quarterly, upon application by the register, without warrant or order from any one; and such has been the uniform practice in this county, with one solitary exception; during the pendency of this controversy, the treasurer being in doubt to whom the salary belonged, made one payment to Davis, under direction from the county commissioners. There is only one contingency named in the Revised Statutes, where the register, in order to receive his salary, is obliged to present any authority, except his own receipt. R. S., ch. 150, ss. 5 and 6, provide that whenever the register of probate shall be unable from sickness, or from any other cause shall neglect to perform his duties, the Judge of Probate for the county shall certify to the treasurer the fact, and the individual who has performed the duties, and the treasurer shall pay the same; in all other cases, in the absence of any positive statute, the practice is uniform, and is in accordance with section 1, of the same chapter, which provides that he shall receive a sum certain, in quarterly payments, out of the county treasury, to pay to the register upon his application alone. In the present case, according to the facts admitted, a demand was duly made upon the treasurer, and payment refused, prior to the commencement of this action. If it be said that we have mistaken our remedy, that *mandamus* is the only proper process to try this question, our answer is, that where a party has been in possession of an office, he may try his right by an action for the profits, and is not obliged to resort to the process of *mandamus*. Com. Dig., vol. 5, p. 31, note 3, T. R., 575.

But should the court otherwise determine as to the proper remedy in such case, it is to be hoped that the main question at issue between the parties may now be determined, as a decision upon the merits, whatever may be the result, will preclude the necessity of further litigation. If against the

plaintiff, of course it is decisive; if in his favor, the county will make payment without further controversy. We come, then, directly to the real question in issue: Was the plaintiff register of probate for the county of Kennebec, during the year 1856; or did he cease to be such, by virtue of the commission and qualification of Davis? Constitution of Maine, art. 10, s. 4, provides that the legislature, whenever two-thirds of both houses shall deem it necessary, may propose amendments to this constitution; and when any amendments shall be so agreed upon, a resolution shall be passed and sent to the selectmen of the several towns, and the assessors of the several plantations, empowering and directing them to notify the inhabitants of their respective towns and plantations, in the manner prescribed by law, at their next annual meeting in the month of September, to give in their votes on the question whether such amendment shall be made; and if it shall appear that a majority of the inhabitants voting on the question are in favor of such amendment, it shall become a part of this constitution.

On the 18th of March, 1855, the legislature, in accordance with the above provision, passed certain resolves providing for certain amendments of the constitution relating to the elective franchise.

The first resolve proposes to amend the eighth section of the first part of article five, by taking from the governor and council the power of appointment of certain civil officers, amongst whom registers of probate are particularly designated; and by adding to the sixth article an additional section, providing for the election of registers of probate, and certain other officers by the people.

The second resolve provides for notice to the several cities, towns and plantations, to vote upon the question whether or not certain officers, (among whom are registers of probate,) shall be elected by the people; *these being the only questions specifically submitted to them for their action,* the resolve then proceeds: "and the ballots shall be received, sorted, counted and declared, in open ward, town

and plantation meetings; and lists shall be made out of the votes, by the aldermen, selectmen, and assessors, and clerks of the several cities, towns and plantations, and returned to the office of the Secretary of State, in the same manner as votes for senators; and the governor and council shall count the same, and make return thereof to the next legislature; and if a majority of the votes are in favor of any of said amendments, the constitution shall be amended accordingly."

The last resolve provides that the Secretary of State shall furnish blank returns to the several cities, towns and plantations, in conformity with the foregoing resolves, accompanied with a copy thereof. On the 19th of November, 1855, a report was made in council, relating to the votes of the people upon the amendments proposed; and upon the second day of January, 1856, a message was sent to the legislature by the governor, transmitting that report, therein stating the fact that a majority of inhabitants voting upon the several proposed amendments, had been ascertained to be in favor of adopting the same, and thereupon declaring the constitution amended. On the 28th of February, 1856, the legislature passed a resolve declaratory of these amendments.

These are the facts, and upon these, two questions are presented for the consideration of the court.

1st. At what *time* was the constitution amended?

2d. Did the amendment affect the appointing power of the governor and council, prior to an election, under the constitution as amended?

The constitution itself answers the first question: when it shall *appear* that a majority of the inhabitants, voting on the questions, were in favor of the amendments, then such amendments shall become a part of the constitution. Thus far it provides, and no farther; it does not require a proclamation by the governor; nor a declaratory resolve by the legislature. Amendments have been made, and constitute a part of our present constitution, without any other evidence of the fact than a simple entry upon the legislative journals; nay, farther, the most important amendment ever made to

the constitution—the amendment of 1839, limiting the tenure of the judicial office, an amendment under which the present members of the court hold their seats, and without which we have no Supreme Judicial Court—was made to *appear* by a mere entry of the acceptance of the report of a committee, upon the journal of the Senate alone.

The House made no record of the fact.

And is this court prepared to oust itself of its own jurisdiction, because there was no legislative resolve declaratory of this amendment.

*How* the will of the people is to be ascertained and made to appear, is to be pointed out and provided for in the resolves themselves submitting the proposed amendments.

From the necessity of the case, this cannot be left to a succeeding legislature—accordingly the resolves of 1855 provide that the votes shall be returned to the office of the secretary of state, in the same manner as votes for senators, and the governor and council shall count the same, and make return thereof to the next legislature, and if a majority of the votes are in favor of any of said amendments, the constitution shall be amended accordingly.

Thus the legislature gave authority to the governor and council to examine the returns, to count the votes, and to ascertain the fact whether or not a majority were in favor of the proposed amendments. This duty they performed— these facts they ascertained, and by a report in council, a matter of record upon their own journal declared, that inasmuch as it appeared to them that a majority of the inhabitants voting upon the several questions submitted were in favor of the amendments proposed, the constitution was thereby amended.

What else remained to be done? " That they should make return thereof to the next legislature"—not of the votes, but of the result of their proceedings in the premises; all this was done—what more was necessary in order to comply with the resolves of 1855? So far as the question of amendment is concerned, surely nothing; the subsequent declara-

tion of the legislature was entirely unnecessary—it was a mere announcement of a fact already known, which must still have existed and appeared as a fact, although no such declaration had ever been made. We contend, therefore, that the constitution was amended when the report of the governor and council was made and returned to the legislature.

The more important question remains to be considered. Did the amendment affect the appointing power of the governor and council prior to an election under the constitution' as amended?

Section 8, part 1st, article 5, provides that the governor, by and with the advice of the council, shall appoint certain officers therein enumerated, amongst whom are registers of probate. The first amendment proposed expressly strikes out and annuls so much of this section as relates to the appointment of registers of probate, and takes away the power from the governor and council to appoint these officers, except in case of a vacancy by death, resignation, or otherwise. It follows then, as a necessary consequence, that from the time when the constitution is amended, it is as if the clause now stricken out had never been inserted—the power once conferred is now annulled, and the very exception already stated, that the governor may appoint in case a vacancy shall occur from death, resignation, or otherwise, clearly shows that he cannot himself create a vacancy by removal. He cannot remove an officer by virtue of section 6, article 9, of the constitution, which provides that the tenure of all offices which are not, or shall not otherwise be provided for, shall be during the pleasure of the governor and council, because that section refers to offices which the governor and council have power to fill; and the amendment having already annulled the power of appointment, has also annulled the power to remove from the office in question.

But it may be suggested that there was no direct vote taken upon the first proposed amendment; our answer is, that such vote was not necessary, nor required by the re-

solves submitting the amendments to the people—the questions upon which the votes are to be cast are all given, and this particular amendment is not one of them. Yet this amendment is to stand or fall with the rest, as a part and parcel thereof—if they fail, that fails—if they are adopted, this is adopted, as a necessary consequence. The legislature might have provided that a vote upon the first amendment should have settled every question, or they might do as they have done—provide, that by a vote upon each officer, and a majority being found in favor of the election of each, the constitution should be amended by striking out the appointing power in such cases, in accordance with the first amendment.

This amendment having then been adopted, and become a part of the constitution, the power of the executive in relation to the office of register of probate having been anulled, except in case of a vacancy as before named, the plaintiff was entitled to hold his office, and to receive the emoluments thereof, until he might be superseded by an election of the people.

We are fully sustained in this view of the case by the opinion of the Supreme Court of Massachusetts. 3 Gray's R., 603.

The Legislature of Massachusetts for the year 1855, had proposed certain amendments of the constitution to the people, for their ratification; one for the election of certain officers by the people, among whom were the registers of probate; and it is rather a curious fact, that one of the resolves provides, that the governor and council shall open and count the votes, and if it shall *appear* that a majority have voted in favor of a proposed amendment, it shall be enrolled and published as a part of the constitution—thereby showing that a thing may *appear* before its appearance has been publicly declared.

But the point to which we wish to call the attention of the court, is this—that there is no striking out of any portion or clause of their constitution, as is the case with our first

proposed amendment—there is no express annulling; it is only to be arrived at by implication.

Under their amendments the very question we are now considering, was answered by the court.

The effect of the amendment upon the power of removal in the governor prior to an election by the people—and the court decide that under their constitution as amended, the power continues to exist until an election takes place; and for what reason? because, they say, "The present amendment contains *no express repeal of pre-existing provisions of the constitution*—it repeals them by necessary implication, by providing *another and different mode of filling these offices*—but it cannot have that effect until it comes practically into operation."

Again, "This necessarily results from the reasons before stated: the amendment in question contains *no annulling, revoking, or repealing clause whatever*; and does not in *terms annul any provision in the constitution;* but it effects such repeal by superseding it, and by providing another mode of filling these offices, incompatible with such pre-existing provisions; as therefore the amendment supersedes and annuls the old provisions of the constitution, by its practical working, in filling these offices in another mode, it follows that it will have that effect, when only in the course of its own regular operation the result has been accomplished." Is it not clearly to be inferred from this opinion, that if the amendment, like our first, had contained an express repeal of pre-existing provisions of the constitution, that their opinion would have been exactly the reverse? In their case the original provisions are left untouched, until the amendment by actual operation supersedes them. In ours, on the other hand, they are stricken out at once. It is as if they never had existed, and when the amendment became a part of the constitution, the attempt to exercise a power no longer in existence, was an act of usurpation, and clearly unconstitutional.

We come, therefore, to the conclusion that the constitu-

tion was amended when the fact was made to *appear* by the report of the governor and council.

That it took effect at *once*, upon the power of removal of certain officers therein named, including that of the register of probate, by striking out of the constitution the power to fill such offices. That the power of the governor to remove, must of necessity be limited to such offices as he had the power to fill. That the plaintiff, being in office under a commission which had yet some two years to run, was entitled to hold the same, and to receive the salary thereof until the first day of January, 1857, when, under the constitution as amended, he might be rightfully superseded by an election of the people.

*S. Lancaster,* counsel for the defendant.

The plaintiff claims to recover, not for services performed, but for services which he was ready to perform, as he alleges, as register of probate for the county of Kennebec, and insists that his claim should be allowed, notwithstanding Francis Davis, during the same period of time, acted in that capacity, doing the duties of the office, and receiving his pay therefor under a commission of later date than the plaintiff's.

The first, and perhaps the only answer that need be made to this, is, that however the law may be in relation to the validity of the commissions of Mr. Davis and the plaintiff, as to which should supersede the other, this action cannot be maintained. This is assumpsit upon an account annexed and for money had and received. *Now there is no contract here expressed or implied between these parties.* The defendant never employed the plaintiff—never promised to pay him. The plaintiff's office is created by the constitution, and he was appointed by the governor, and while he filled it he was a public officer, carrying into effect a public law for the public good. *Emerson* v. *Washington County,* 9 Greenl. R., 98.

Then as the plaintiff was never employed by the defendant, as defendant never promised to pay him, he will not ex-

pect to recover on the ground of an express promise, and any implied promise is sufficiently negatived by the fact that the defendant paid Mr. Davis as his salary became due. This would seem to be a sufficient answer to any implied promise under either count. When the action was brought there was no money in the hands of the county treasurer for the salary of the register of probate for the time embraced in the plaintiff's writ. It had been paid to Mr. Davis. So far, this argument would seem to be pertinent and decisive, even if the plaintiff had performed the duties of the office, and had not received his pay. But in this case the plaintiff rendered no service in that office for the time covered by his suit, but on the contrary the place was filled during the same time by another man, and he was paid the salary, the first payment having been made by the *written order* of the county commissioners, thereby putting an *express* negative upon every sort of promise either express or implied; for in deciding to pay Davis, they *decided not to pay the plaintiff*. Here, then, was an express refusal to pay the plaintiff. If the plaintiff ever had any rights in the premises, this is not his remedy. He should have begun earlier and by a different process; by petition for a *mandamus*, or by taking the requisite measures to obtain a process of *quo warranto*. But the plaintiff had no rights after Mr. Davis was appointed, to be redressed in any form before any court.

The papers on the face show that the plaintiff did not hold the office during the time for which he has sued. He attempts to avoid this by contending that his commission was in full force, while that of Mr. Davis was inoperative and void. His argument is, that the constitution had been changed by the popular vote at the September election in 1855, whereby all authority to appoint to that office had been taken from the governor, so that at the time Mr. Davis was appointed the governor had no authority to make the appointment.

The presumption is that Mr. Davis was legally appointed,

and the burden is on the plaintiff to make out *a clear case* to the contrary, before he can expect the court to decide in his favor.

The argument he uses in support of his propositions seems to be a *felo de se,* for it destroys itself. I do not find anything which calls for an examination of the argument to support the plaintiff's claim, it appearing to me at best to be nothing but a bold assertion, without precedent or authority, or any sound or practical construction to maintain it.

Now if the constitution had become so amended at the September election in 1855, or when Governor Morrill made a proclamation which he had *no right to make,* then it would follow, not only that the commission of Mr. Davis was void, but also that the plaintiff's would share the same fate, for when that power was stricken from the constitution, all commissions depending upon it must necessarily have fallen with it. So surely as the branches cannot survive when the axe is laid at the root of the tree, or streams flow when the fountain head is dried up, just so surely must all commissions have perished with the power that gave them birth. But the constitution had not been so amended at the time Mr. Davis received his appointment.

The only provision for amending it is found in s. 4, article 10, which entrusts this power to the legislative department.

This section is as follows:

"SECT. 4. The legislature, whenever two-thirds of both houses shall deem it necessary, may propose amendments to this constitution, and when any amendments shall be so agreed upon, a resolution shall be passed and sent to the selectmen of the several towns and the assessors of the several plantations, empowering and directing them to notify the inhabitants of their respective towns and plantations, in the manner prescribed by law, at their next annual meetings in the month of September, to give in their votes on the question whether such amendment shall be made; and if it shall appear that a majority of the inhabitants voting on the

question are in favor of such amendment it shall become a
part of this constitution."

Am I not right in saying that this section confides to the
*legislature* the business of amending the constitution—or
perhaps I should say of proposing amendments and of super-
vising their progress to the end?

The legislature, when two thirds of both houses *deem it
necessary,* may propose amendments.  Here two thirds of
both houses are first to concur in the opinion that it *is nec-
essary,* before any amendment can be proposed; then a reso-
lution is to be sent out submitting it to the people, and if it
shall appear that a majority of the inhabitants voting on the
question are in favor of such amendment, it shall become a
part of this constitution.

Appear to whom?   To whom but those who are entrusted
with the care and supervision of that business?   Now if the
legislature of 1855, in the resolve submitting the proposed
amendments to the people, had required nothing more than
that the votes should be returned to the office of the secre-
tary of state, then what measures would have been required,
and by whom, in order to determine whether the amend-
ments had been adopted by the people?   To whom, in that
case, must it have been made to appear that a majority vot-
ing on the question were in favor of the amendments?   I
think no one will deny that then the legislature would have
been required to ascertain whether the amendments had
received a majority of the votes thrown on the question.
This is the same thing as saying that the constitution con-
templates that it should be made to appear *to the legislature,*
that a majority of those voting had voted for the amend-
ments, and that legally—which I think is very plain.   The
constitution does not contemplate or recognize any other
body than the legislature as having aught to do with the
business; it makes it the duty of the legislature to do this
work.   If this be so, then the next question that arises is,
did the legislature of 1855, in their resolves accompanying
the proposed amendments, do anything to change the course

of procedure at all? I will not discuss the question whether it would have been competent for them to do so, as I do not find *any evidence* in the resolves of *any such intention.* The votes were required to be returned to the office of the secretary of state in the same manner as votes for senators; and the governor and council were to count the same and make return thereof to the next legislature; and if a majority of the votes were in favor of any of said amendments, the constitution was to be amended accordingly. Now, I think nothing can be more palpable, than that the service required of the governor and council was purely ministerial, and that not final, but only in aid of the next legislature. If this were not so, if a different purpose were intended, why did not the resolve so declare? Why not authorize the governor and council to look into the *legality of the voting* and to make proclamation? Nothing of this kind was done, but, on the contrary, the governor and council were simply to count the votes and make return thereof to the next legislature. Why to the next legislature but for their action thereon? Again, *after* the governor and council had so counted the votes and made return thereof to the legislature, the resolve then adds, " and if a majority of the votes are in favor of any of said amendments, the constitution shall be amended accordingly." What can this mean but that if *after* the return is so made to the legislature, *they should find* a majority of votes in favor of any of said amendments, the constitution should be amended accordingly?

This view is confirmed by the following provision in the resolve: "And in all cases of elections provided for in this resolve, the first elections shall take place on the days and times herein prescribed, occurring next after the amendment providing for such elections, shall have been declared by the legislature to have been adopted as a part of the constitution." This clause makes it the duty of the legislature, in a certain contingency, to declare the proposed amendments to have become a part of the constitution. When were they to do this? I answer, when it appeared to them that the

amendments had received a majority of the votes legally thrown on that question, and this would be when they had ascertained that fact by such means as they saw fit to employ. This seems to be the view which the legislature has uniformly taken, both of its duties and its powers, in relation to any proposed amendments of the constitution. In every instance a committee has been appointed to ascertain whether the amendments had received a majority of the votes thrown on the question; this committee has reported, and the legislature has acted on the report; and this, as I have endeavored to show, is what the constitution contemplated.

When it had been made so to appear to the legislature, and they had declared the constitution amended accordingly, at what time would the amendments take effect and become operative? Clearly on the first day of January, 1857, this being the commencement of the term of such as were to be elected by the people—they were to be elected at the annual election in September next after the legislature had declared the amendments to have been adopted, and their terms were to commence on the first day of January following; in the mean time the power to appoint and remove must of necessity have remained in the governor as before. This seems to be the only practical view which the case admits of, and such as the Supreme Court of Massachusetts have taken of a similar case, which arose on amendments to the constitution of that commonwealth.

Upon any other view it would be impracticable to administer the government; for if the amendments took effect and became operative, either when the people voted, or when the governor and council counted, or when the legislature made the requisite declaration, then, as we have endeavored to show, all commissions which issued from the governor, were that moment rendered null and void, and the vacancies occasioned thereby could only be filled by the people at the next September election, and those thus chosen could not enter upon the duties of their offices till the first day of January following—thus vacancies would be created that could not

be filled for all that time. If it should be said that the amended constitution provides for filling vacancies, in reply I say, that these would not be vacancies occurring under it, but such as arose before these offices were filled in the manner contemplated by it, and so would not come within any of its provisions.

Under such a state of things how could the government get along? I therefore respectfully submit, that the amendments did not become operative till the first day of January, 1857, and that, up to that date, the power to appoint or remove remained with the governor, under the old constitution.

TENNEY, C. J. The plaintiff was commissioned as register of probate for the county of Kennebec, by the executive of the state, on February 28, 1854, and after being qualified according to law, entered upon the discharge of the duties of that office. By the appointment under the constitution and laws of the state, then in force, he was entitled, upon the fulfillment of his trust, to receive the salary provided, for the term of four years from the date of his commission, unless removed, as he might be, at any time by the governor and council.

Resolves, entitled " Resolves providing for an amendment of the constitution, relating to the elective franchise," were passed by the legislature, by two thirds of each branch, on March 17, 1855. These provided for the choice of judges and registers of probate, and of sheriffs, by the people of each county; the first election of these officers to take place at the annual election, on the second Monday of September, next after the amendment, providing for such elections, shall have been declared by the legislature to have been adopted as a part of the constitution; and the persons elected to hold these offices for four years, commencing on the first day of January next succeeding their election.

As early as February 28, 1856, when " the legislature passed a resolve declaratory of amendments of the constitu-

tion," it appeared that a majority of the inhabitants voting on the questions proposed by the resolves of March 17, 1855, were in favor of the amendments, and thèy became a part of the constitution, according to article 10, section 4, of the constitution of this state. Whether it so appeared, at the time the state of the votes was ascertained by the governor and council, or at the subsequent time, when "a message was sent to the legislature by Governor Morrill, transmitting the report of council upon the proposed amendments," according to a proper construction of said section, is a question which we think is not necessarily involved in a proper decision of this case, and no opinion is expressed thereon, notwithstanding reasons plausible, at least, may exist in favor of the affirmative, in one or the other of the alternatives mentioned.

Each of the amendments proposed in the resolves, having received the requisite majority to make them effectual, became a part of the constitution, at the same time, and before the new provisions could become operative. Elections were to take place, and after the votes were counted, and the choice determined, a still further period was to elapse before the officers elect could commence the discharge of the appropriate duties. And in relation to the offices of judges and registers of probate, and of sheriffs, no election could be declared till the legislature had made some provisions by which the amendments could be practically effective. The time of the first election of those officers depended upon that when the legislature should declare that the amendments had been adopted as a part of the constitution. If this declaration had been postponed till after the annual election on the second Monday of September, 1856, it is not seen in what manner the election of the officers named could have been chosen earlier than the annual election in September of the succeeding year. The amendments as contained in the resolves, made no provision in relation to the place to which the votes should be returned, or by whom counted and declared, and notice given to the persons elected. Herein the

amendments did not differ in character from certain provisions in the original constitution. That became the frame of government, when it appeared to have been adopted by the people, in the mode provided; but in some respects it could not be effectual, till after legislative enactments. As an example of this, we refer to section 1, of article 6, declaring that the judicial power of this state shall be vested in a Supreme Judicial Court, &c. With nothing but the constitution, this provision, important, and it may be said essential to the security of public and individual rights, was lifeless, till the legislature determined the number of judges of that court, and its jurisdiction, or until the executive should make appointment of its members, according to other parts of the constitution.

It is manifest that the additions to the constitution, by the amendments, had no validity at an earlier period than that, when the portion which was stricken out thereby ceased to be a part of that instrument, or the contrary. The parts expunged from the constitution as it formerly was, and those added thereto, in the amendments proposed in the resolves, were designed only to present the reading of the provisions, as they should be under the amendment, and were the same thing as it would have been to have provided, that instead of *such* sections as they stood in the constitution at the time the resolves were passed, the following should be substituted; or that the parts proposed to be changed should be altered, so that they should read as follows. The amendments in the constitution of Massachusetts, adopted in 1855, referred to by the plaintiff's counsel as being essentially distinguished from those of this state, which we are considering, are believed to be in substance precisely similar, though in form they may differ. The amendments of the constitution of this state contain no express repeal of the provisions of the constitution, intended to be changed, more than do the amendments of that of Massachusetts. The terms, "and by striking out the words," used in the resolves cannot be regarded as designed to repeal the then existing provisions

of the constitution, when the parts added could have no such effect. But the new provisions, as a whole, standing as they do, take the place of the old, without the least regard to the distinction between the parts stricken out of the latter, and those added thereto.

The title of the resolves and the provisions therein, when examined together, show clearly that it was the design, at a time subsequent to that when the amendments should become a part of the constitution, that the offices referred to should be filled by popular or legislative election, and not by appointments made by the executive. Was it not intended that the power of the governor and council to make such appointments, and the right of the incumbents in office, under such appointments, to continue therein, should become extinct simultaneously? The expression of the popular voice in elections, which should annul the former, at the same time was to take away the latter. When the executive was deprived of its previous rights in this respect, and relieved from the performance of its former duties therein, as being in contravention of the amended constitution, how could the officers of its appointment hold their places, when the same amended constitution affirms, that the tenure of office shall be under the declaration of the people's will, as provided therein? If the former authority of the governor and council was struck down by the amendments, on what principle can the tenure of office longer survive, irrevocable, when that tenure was by constitutional provisions which have been annulled?

The conclusion, to our minds, is irresistible, that the rights of the governor and council to appoint judges and registers of probate, and sheriffs, and the rights of those officers under their commissions, were swept away by the amendments, at one and the same time.

This brings us to the inquiry, at what time did these rights cease? If they ceased at the time when the governor and council ascertained by counting the votes, that a majority of the inhabitants voting, was in favor of the amend-

ments, or when the report of the council upon the proposed amendments was transmitted to the legislature, the plaintiff has no cause of action, as he makes no claim for any part of his salary which accrued prior to February 1, 1856. If the authority of the executive, and the rights of the plaintiff continued till the legislative declaration that the amendments were adopted, unaffected by those amendments, provided there had been no new executive appointment, the action of the governor and council in removing was constitutional, and this suit must fail.

But it is not contended by either party, that the offices of judge and register of probate, and of sheriff, were suspended from the time when the amendments became a part of the constitution, till the time when these officers elected by the people, were entitled to assume the duties thereof. The discharge of these duties is so important to the community, that a different construction should not be adopted, unless the language of the resolves absolutely demands it.

The resolves have provided no mode by which the legislature could have caused the performance of the duties of these offices, by those elected under the amended constitution, before January 1, 1857. If it was contemplated that such officers should exist, and have authority to perform their appropriate functions, as we cannot doubt that it was, under what power were they to receive their commissions, in case of vacancy? Was it under the constitution as it was before the change, the executive retaining its former authority; or by virtue of the provision in the resolves, in s. 7, added to art. 6 of the constitution? By this section it is quite obvious that the vacancies therein mentioned are exclusively those which occur by death, resignation or otherwise, after the elections have taken place under the amended constitution. If, however, it were otherwise, it could not aid the plaintiff in a successful prosecution of this suit, for if a vacancy took place in the office of register of probate in the county of Kennebec, before the first day of

January, 1857, he was not appointed by the governor and council to supply it.

The amendments, as we have before seen, contain no express abrogation of any of the provisions in the constitution as it was previous to the amendments, excepting so far as the new mode of filling the offices referred to, supersedes, of necessity, those provisions. Hence the old mode of appointment cannot be regarded as repealed, any further than it stands in the way of a practical operation of the mode prescribed in the amendments, and adopted by the people as a part of the constitution. 3 Gray's R., 602.

Again, the tenure of those offices was not provided for upon the hypothesis that it was not designed by the legislature which passed the resolves, that upon their adoption the offices to be filled by election, should remain vacant till those chosen thereto should commence the performance of their duties; and that the former provisions of the constitution, touching the matter in question, were annulled. In such cases, by art. 9, s. 6, the tenure shall be during the pleasure of the governor and council. This view was anticipated by the counsel for the plaintiff in his argument; and it is insisted that this section has reference only to those offices which the executive have power to fill. This section is under the article entitled " general provisions," which treats of matters various in their character, such as commissions to be signed by the governor, the elections required to be made on the first Wednesday of January annually, and the removal of officers by impeachment, and by the governor and council, on the address of both branches of the legislature. The section in question, of itself, or in its connection with other sections in the same article, does not appear to be designed to be affected by the limitation contended for. It is true, that the tenure of elective offices are generally, if not universally, provided for in this state. But we are now examining the tenure of offices which had been filled by executive appointment, and which were to be filled afterwards by those chosen by the people, under the amendments which became parts of

the constitution, anterior to the time when these officers could act by virtue of their election. No reason is perceived for denying to the executive the authority to make the appointments during this interval, under the provision referred to.

Francis Davis was appointed by the governor, by and with the advice and consent of the council, register of probate of the county of Kennebec, on January 23, 1856; was qualified on February 1, 1856, and on the same day entered upon the discharge of the duties appertaining to that office. In this appointment the executive did not transcend the limits of the power conferred upon it by the constitution. Mr. Davis was by right the register of probate from the time he was qualified to act as such, and his acceptance of the trust, under his commission, operated as the removal of the plaintiff.

Other questions have been discussed in argument, the consideration of which becomes unnecessary, under the view which we have taken.

*Plaintiff nonsuit, judgment*
*for the defendant.*

DAVIS, J. I concur in the result only. On grounds not discussed in the opinion, I conclude that the county commissioners were justified in ordering the register *de facto,* who performed the duties of the office, to be paid by the county treasurer. Whatever rights or remedies the plaintiff may have against other parties, I do not think this action can be maintained.

But I cannot agree with my associates in the reasons which they have given as the basis of this conclusion. And as important questions are involved, which may be raised again whenever new amendments to the constitution are proposed, I have concluded to state the reasons for my dissent.

There are two or three familiar principles, unquestioned, of which I think we need to be reminded.

All proper governmental power is inherent in the people.

Constitution, art. 1, s. 2. All officers, however elected or appointed, in administering the government, are the agents of the people. For the purpose of a government, the people have adopted a written constitution. This constitution may be amended from time to time, like any other statute law; but at any given time it consists of certain definite words and sentences. If it is amended, it is done by striking out certain words and sentences contained in it, or in adding words and sentences to it. And there is some definite point of time when the change is made.

When the constitution of this state was formed, the office of governor was established; and also the office of register of probate. *The office* is entirely distinct from *the person filling it,* though the same words describe each. The office exists, whether filled or vacant. And *the mode of filling it* is also an entirely distinct matter from the office, as established. Any change in the manner of filling an office, does not affect its existence, or the duties appertaining to it.

The people concluded to fill the office of governor themselves, by election, instead of delegating authority to any man, or to any body of men, to do it for them. But they did not, at first, think best to fill the office of register of probate in this way. They gave the governor and council a power of attorney to do it for them. Const., art. 5, part first, s. 8. But the person so appointed by the executive was the agent of the people,—responsible to them alone. His commission was from the governor, but in behalf of the people. And though the governor should die, or go out of office, if at the time of the appointment he was duly authorized to act for the people, the commission might be still in force. The plaintiff was appointed register of probate for the county of Kennebec, February 28th, 1854. In accordance with the law at that time, his commission was for four years. As the office was established by the constitution, and he was appointed to fill it *by the people,* acting through the executive, he had the right to hold the office until Feb-

ruary 28th, 1858, unless *the people,* primarily or by some duly authorized agent, removed him from it,—or, by amending the constitution, abolished the office.

In 1855 the people did amend the constitution relating merely to the *mode of filling* this office. And upon this amendment three questions arise. When did it take effect? How did it affect the power of the governor and council to remove registers of probate from office? How did it affect the rights of registers then in office?

1. When did this amendment take effect?

The constitution itself provides that amendments proposed by the legislature shall be submitted to the people, who shall vote thereon; "and if it shall appear that a majority of the inhabitants voting on the question are in favor of such amendments, it shall become a part of the constitution." The people voted on this amendment in September, 1855. The mode prescribed by the legislature by which the result should "appear," was, that the lists of the votes should be returned by the several towns to the secretary of state, and be counted by the governor and council. This count was made in November, 1855, and on the first Wednesday of January, 1856, "return thereof was made to the next legislature," as the resolves required.

I think that the amendment took effect when the governor and council "counted the lists" returned, and officially adjudicated upon the result. *Then* it constitutionally "*appeared* that a majority of the inhabitants voting on the question were in favor of the amendment." This duty and power of determining this question were committed to the governor and council in their official capacity, as the executive department of the government; and their decision was effectual and conclusive. So it has been held by this court. *Dennett, pet'r,* 32 Maine R., 508.

But whether the amendment took effect when the lists of votes were counted and adjudicated upon by the governor and council, or when they "made return thereof to the next legislature," is immaterial. Both had been done before the

Burton *v.* County of Kennebec.

governor and council in 1856 assumed the power to remove the plaintiff from office. And I do not understand the majority of the court as denying that upon the performance of one or the other of these acts, the amendment took effect. They say, "no opinion is expressed, notwithstanding reasons plausible, at least, may exist in favor of the affirmative of one or the other of the alternatives mentioned."

2. Did the amendment annul the power of the governor and council to appoint registers of probate?

The only appointing power for this office conferred by the constitution as it was before the amendment, was given by the eighth section of the fifth article. By this section the governor and council were empowered "to appoint" persons to fill certain offices, among which were "registers of probate." By the amendment these words—"registers of probate"—were "stricken out," and a section was added, providing for their election by the people.

A subsequent statute repugnant to former statutes operates as a repeal of them, without any express provision to that effect. *Commonwealth* v. *Kimball*, 21 Pick. R., 373. But in this case the people not only reassumed the power to fill the office of register of probate themselves, which they had previously delegated to the executive; they actually *revoked* the authority of the governor and council thenceforth to appoint, by "striking out" the only provision in the constitution by which that power had been conferred.

I understand, however, that the majority of the court hold that when the amendment was adopted, and the constitution actually amended, "by striking out the words, 'registers of probate,'" the words were not thereby stricken out, nor the provision repealed. They say, "the terms—'and by striking out the words'—in the resolves cannot be regarded as designed to repeal the existing provisions of the constitution, when the parts added would have no such effect."

I am unable to assent to this proposition. When the people vote to "strike out" a provision of the constitution, if that does not repeal it, I am at a loss to know in what way

Burton *v.* County of Kennebec.

any provision of the constitution can be repealed. It is precisely the same language generally used by legislatures in repealing portions of any statute; and these have always been held effective for that purpose, whether any provisions have been added or not. To hold otherwise is to hold that the people have no power to *repeal* any portion of the constitution; that they cannot strike out, but only add thereto. This will hardly be asserted by any one. But if the people have the power, by any language, to repeal any provision of the constitution, in what way could they have exercised it more palpably than by voting to amend it "*by striking out*" the provision empowering the governor and council "*to appoint registers of probate?*" To my mind the conclusion is irresistible, that the moment the amendment was adopted, the power of the governor and council to fill that office by appointment, except in the contingencies provided for by the amendment, ceased.

3. What effect did the amendment have upon the rights of registers of probate then in office?

The amendment did not in any way affect the office, except to limit the tenure of it, when filled by election, to two years. The great purpose of the amendment was to change *the mode of filling the office.* Those who were then in office were not to be affected by it, until others should be chosen by the people to succeed them. Until then, unless their commissions expired earlier, they were legally in office. If their commissions had expired earlier, then the office would have been vacant; and it would clearly have been a "vacancy," (not *created* by a removal, no power for which was conferred by the amendment,) but a "vacancy *occurring* by death, resignation, or *otherwise*," which the governor and council were empowered by the amendment to fill. But unless their commissions expired before January 1st, 1857, the registers then in office had the right to hold the offices until that time. The people by the amendments had said, "we revoke, from this day, the power of the governor and council to fill these offices; we ourselves will choose persons to go

into them the first day of January, 1857." How could they have said any more distinctly to those in office, "you are to remain there until that time?"

It is asked, however, "if the former authority of the governor and council was struck down by the amendments, on what principle can the tenure of office longer survive irrevocable, when that tenure was by constitutional provisions which have been annulled?" And it is said that if the amendment divested the governor and council of the power to appoint registers of probate, then "the rights of those officers under their commissions were swept away by the amendments at one and the same time."

The fallacy of this proposition is in the assumption that registers of probate were not the agents of the people,— but merely the agents of the governor and council. If this were so, then, indeed, the removal of the governor, or a revocation of his appointing power, would have "swept away" the official rights of all persons appointed by him. But if registers of probate were the agents of *the people*, then the revocation of the authority before that time given to the governor and council to appoint, did not affect *them*. As well might it be contended that the removal of a superintendent of a railroad corporation, or a revocation of his authority to employ servants for the company, would "at one and the same time sweep away" the rights of all the employees. It certainly requires no argument to demonstrate that the revocation of that part of a power of attorney by which an agent had been authorized to appoint other agents for the principal, would not revoke the authority of any agents previously appointed by him. Their agency would continue until revoked by the principal himself. So the agency of registers of probate continued until the people, who took the appointing power away from the governor and council that they might exercise it themselves, did actually exercise it by choosing other agents in their places.

It is insisted, however, that the power of removal was still retained by the governor and council under the sixth section

Burton *v.* County of Kennebec.

of the ninth article of the constitution:—"the tenure of all offices which are not, or shall not be otherwise provided for, shall be during the pleasure of the governor and council."

It is a sufficient answer to this, to say, that if the governor and council had the power to remove under this provision, they have the same power still—which no one pretends. This provision is still in the constitution; and if they have not *now* the power to remove registers of probate, it is only because the tenure of that office was "otherwise provided for" by the amendment. If being "otherwise provided for" took away the power of removal, as in my opinion it clearly did, then it was taken away when the amendment took effect.

It should be noticed, too, that it is the *tenure of the office* to which it refers; and not the right of any particular incumbent. That the amendment did "provide for" the tenure of this "office," is beyond all question. It follows conclusively that it was no longer embraced in the provision referred to.

I have thus given the reasons why I cannot concur in the doctrines expressed in the opinion of my associates, as much as I regret to differ from them. And there is one other principle, not very distinctly expressed, but apparently pervading their opinion, from which I must dissent. I refer to the idea that, though the amendments took effect when it appeared that they had been adopted by the people, they did not really constitute a part of the constitution until the officers specified had been chosen by the people, and had entered upon the discharge of their duties; that during the year that intervened, neither the old provisions, nor the new, were absolutely a part of the constitution; and yet that both were, in some sense, parts of it; that the amendment to the constitution was a gradual process, covering the whole of the year 1856, during which the amended provisions were a kind of constitutional chrysalis,—neither a butterfly, nor a caterpillar,—and yet both the one and the other, as exigencies might require. I am not certain but that this view found some favor in the Massachusetts opinion, which is cited. But I have been accustomed to regard the constitution as com-

posed, at all times, and at every given period of time, of certain definite, ascertainable words and sentences, actually in force,—and so composing the whole of it that no other provisions could, in any sense, be in force as a part of it. I am therefore of opinion that when the amendments took effect, whatever provisions were added were thenceforth actually a part of the constitution; and that whatever was repealed was instantly and absolutely void. There was certainly no provision that the force of the one should be continued, or that of the other be stayed. And as the only provision whereby the people had conferred upon the governor and council the power " to appoint registers of probate " was by the amendment " stricken out," I believe that the appointment of Francis Davis to that office January 23d, 1856, was unconstitutional and void.